IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

OSHAY RANDOLPH,

                Plaintiff,                OPINION AND ORDER

    v.

                                      21-cv-105-wmc

DANIEL NORGE and STEPHEN BUTTS,

                Defendants.

---

*Pro se* plaintiff and state prisoner Oshay Randolph claims that two psychologists at Columbia Correction Institution violated his constitutional rights by both failing to protect him from sexual assault and to treat his serious mental health needs. Before the court is defendants' motion for summary judgment, in which they argue that their actions neither violated Randolph's constitutional rights nor caused him any harm. In considering the motion, the court has viewed the evidence in the light most favorable to Randolph. Even from this perspective, however, Randolph has failed to submit sufficient evidence from which a reasonable jury could find either defendant violated his constitutional rights. Accordingly, the court will grant defendants' motion.

UNDISPUTED FACTS[1]

**I. October 15, 2018 Incident**

Plaintiff Oshay Randolph was incarcerated at Columbia Correctional Institution (CCI) during the times relevant to this case. Both defendants, Dr. Daniel Norge and Dr. Stephen Butts, worked as psychological associates in CCI's Psychological Services Unit

---

[1] The following facts are drawn from the parties' proposed findings of facts and responses, and are undisputed except where noted. All facts are drawn in the light most favorable to the plaintiff, as the nonmoving party.

(PSU), although a number of others also worked in PSU and are referred to by name or more generically as "psychologists" or "psychiatrists."

On October 15, 2018, Randolph was sleeping on his bunk when his cellmate grabbed his leg and threatened to have sex with him. Randolph sat up quickly, hitting his head. Later that day during medication pass, Randolph's cellmate further told a passing correctional sergeant that he was having thoughts of raping someone, *and* that he was going to rape Randolph if not moved out of his cell. The correctional sergeant reported the cellmate's statements to another sergeant, who decided that Randolph should be removed from the cell. After Randolph spoke to a lieutenant and Dr. Norge about his cellmate's threats, he was then placed in a different cell.

There is some evidence in the record suggesting that Randolph's cellmate had told Dr. Norge that he was thinking about sexually assaulting another inmate before the October 15 incident. Specifically, in an incident report written after the October 15 incident, an officer wrote that Norge "reported being aware of similar threatening like behavior" from the individual, "which is believed to be an attempt to be identified as a Do Not Double inmate." (Dkt. #30-6, at 1.) Another officer wrote that Randolph's cellmate had been "upset that Dr. Norge was not taking him seriously" and "he had been having thoughts of raping someone." (Dkt. #30-7, at 1.)[2] Dr. Norge does not explicitly deny in his declaration that Randolph's cellmate discussed such behavior with him, but he does state that, "if Randolph's cellmate had expressed to me during any PSU session, or at any

---

[2] Because these statements are included within an incident report written by someone who was neither Dr. Norge nor Randolph's cellmate, the statements are hearsay, as discussed in the opinion section below.

2

other time, he had thoughts of sexually assaulting Randolph, I would have reported it to the security supervisor and then also reported it as PREA." (Dkt. #23, ¶ 10.) There is no evidence in the record that Dr. Norge ever reported Randolph's cellmate to security or PREA staff.

## II. Randolph's Mental Health Needs

Before the October 15 incident with his cellmate, Randolph had no serious mental health problems and received mental health care only on an "as needed" basis. After the incident, however, Randolph began experiencing anxiety, paranoia and depression. He also began submitting numerous requests for psychological services from PSU.

On November 6, 2018, in particular, Randolph submitted two psychological services requests (PSRs). In the first, Randolph referred to making three other requests for psychological services, but still not being seen. In the second PSR, he described being "very depressed and not getting sleep" and having "bad bad thoughts." (Dkt. #29-1, at 2.) On November 7, Randolph was seen by a psychiatrist, Dr. Lindner, who discussed psychological medications with him. PSU also received both of Randolph's November 6th PSRs on November 8, and Dr. Norge responded to both the same day, stating that he would see him soon.

On December 14, 2018, Randolph submitted another request to be seen by psychological services, writing that he was depressed, could not sleep, had no one to talk to, and was "not okay at all." (Dkt. #26-1, at 39.) Randolph also noted that he had been seen at his cell, but wanted to be pulled out of his cell to talk to someone. The same day that PSU received this request, a different psychologist came to see Randolph in the day

3

room. That psychologist noted Randolph's concern with being moved from his single cell and being paired with another inmate because a former cellmate had grabbed him while he was asleep. Nevertheless, the psychologist told Randolph that there was no clinical, psychological reason for him to have a single cell, so he would have to direct a single cell request to security staff. That same psychologist further noted that: Randolph had no active mental health concerns; and he did not endorse being stressed or unable to sleep as previously stated in his December 14th PSR. (Dkt. #26-1, at 15.)

About three weeks later, Randolph submitted a PSR to "talk about meds ASAP." (Dkt. #30-4, at 2). Yet another psychologist from PSU responded to that PSR, noting that Randolph had just discussed his medications with Dr. Linder on November 7, and that he should submit an HSU request to discuss medication. (*Id.*) A couple of weeks later, Randolph submitted another PSR stating that he was "depressed" and "needed to be seen right now," as well as that "this is about to get out of hand real fast!" (Dkt. #26-1, at 25.) The next day, a different psychologist conducted a clinical check-in with Randolph in the dayroom. That psychologist noted that Randolph used the session to vent about lock-down related frustration, but did not raise mental health concerns. (Dkt. #26-1, at 14.)

Between February 20 and March 1, 2019, Randolph submitted four more requests to be seen by PSU. In two of those PSRs, Randolph stated that he had almost been raped and was stressed. PSU received all four requests on March 4, and a non-defendant, licensed professional counselor saw Randolph the next day. (Dkt. #30-4, at 3.) Randolph talked to that counselor about the October 2018 incident with his cellmate, and reported embarrassment, anxiety and paranoia should others find out about the incident. He also

4

described having difficulty falling asleep and worrying about what his new cellmate was doing, which was leading to him being irritable and depressed. (Dkt. #26-1, at 13.)

In response, the counselor shared positive coping and relaxation techniques. (*Id.*, at 46.) In the counselor's progress notes, she also wrote that "aside from need for development of positive coping skills," Randolph "appears to be functioning adequately. His mental health code and diagnosis remain the same." (*Id.*)

The same counselor saw Randolph twice on March 22, 2019, who unfortunately again expressed anxiety and paranoia related to the October 2018 incident. The counselor gave Randolph handouts regarding PTSD and avoidance. She also offered to schedule to see him more regularly, but emphasized that he needed to be motivated and should write a list of things that he would like to work on or skills he would like to develop and why. (Dkt. #26-1, at 11–12.) Randolph saw the same counselor again less than a week later. She noted that Randolph would be seen once every three weeks to work through a "Seeking Safety" workbook. (*Id.* at 10–11.) Randolph saw the same counselor six times in April 2019. The counselor did not make any more notes suggesting that Randolph wanted to discuss the events of October 2018.

On April 28, 2019, Randolph submitted another PSR, this time stating that he had told a correctional officer that he was suicidal, but was placed in "seg," rather than "on watch." (Dkt. #26-1, at 16.) Randolph submitted another PSR the next day, stating that his sleep medication dosage needed to increase. PSU responded to these requests by stating that: he had been scheduled to be seen by a psychologist; and his medication request had been referred to the psychiatrist within HSU. In addition, a psychologist sent Randolph a letter, explaining that security staff reported placing him in segregation because he refused

5

a direct order to return to his cell, allegedly stating, "Well, if I'm not going to get the phone, then I guess I'm feeling suicidal." (*Id.* at 17.) The psychologist reminded Randolph that staff make placement determinations, not inmates.

Sometime between May and July, Randolph was transferred to another unit. On July 23, 2019, Dr. Butts saw Randolph for the first time for a clinical "check-in" appointment. During this session, Randolph reported feeling "good," stated that he was "maintaining," was working in maintenance, and wanted to become a peer mentor at the prison. (*Id.* at 1–2.) Dr. Butts further noted that Randolph had stable mental health, adequate adjustment and functioning, and a low risk of self-harm.

Randolph did not request individual psychological services again until December 23, 2019, when he submitted a PSR stating that he was having "flashbacks/nightmares" about "getting sexually assaulted," he was "waking up in cold sweats," and he was very depressed and having a hard time coping. (Dkt. #26-1, at 42.) Randolph submitted a request again the following day, stating that he was having nightmares about an incident that had happened the previous year. (*Id.*, at 30.) Randolph was seen by a different psychologist on January 14, 2020. That psychologist noted Randolph wanted his medication adjusted and scheduled him to be seen by a psychiatrist.

A week later, Randolph submitted another PSR, stating that he was depressed and still having trouble sleeping. A few days after that, Randolph submitted yet another request stating that he had been sexually assaulted in the past, his PTSD was worsening, and he was "in a very dark place." (*Id.*, at 29.) At that time, PSU placed Randolph on a list to be seen by a psychologist. Although Dr. Butts then tried to see him on February 4, 2020, Randolph was at another appointment.

On March 30, 2020, Randolph submitted another PSR, which stated that he was depressed, stressed, getting little sleep, and had not been able to cope with being sexually assaulted in October 2018. (Dkt. #26-1, at 41.) Dr. Norge responded that Randolph was "on a list of individuals requesting to be seen" and appointments were being made "according to clinical need." (*Id.*) The record at summary judgment does not indicate when Randolph was next seen by PSU staff, but he filed this lawsuit approximately one year later, in February 2021.

## OPINION

Plaintiff contends that defendants violated his Eighth Amendment rights in two ways: (1) Dr. Norge failed to protect him from his cellmate's behavior, despite knowing that the cellmate had threatened to rape or harm another inmate; and (2) Dr. Norge and Dr. Butts failed to provide plaintiff with adequate mental health care to treat the mental and emotional distress that he developed as a result of his former cellmate's actions. The court addresses each claim below.

### I. Failure to Protect

The Eighth Amendment's prohibition on cruel and unusual punishment protects prisoners from violence at the hands of other inmates. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). For an individual prison official to violate that protection, however, they must act with deliberate indifference to an objectively serious risk to the prisoner's health and safety. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Thus, a deliberate-indifference claim under the Eighth Amendment requires proof of the following three elements: (1) an objectively serious risk of harm that "must in fact materialize"; (2)

the defendant knew of the risk; and (3) the defendant's response to the risk was so inadequate as to constitute disregard of or deliberate indifference to the risk. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (citations omitted).

Applying this standard to plaintiff's failure to protect claim against Dr. Norge, the court concludes that plaintiff has failed to submit evidence sufficient to satisfy any of the three elements of his claim. First, although his cellmate's threat of rape was objectively serious, that the risk never actually materialized. Rather, plaintiff alleges that his cellmate grabbed his leg and made a verbal threat, after which plaintiff was removed from the cell. In particular, plaintiff submits no evidence suggesting that the grabbing was physically painful or amounted to a sexual act. And although plaintiff purports to have suffered lingering mental and emotional distress from his cellmate's behavior, "not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Leiser v. Kloth*, 933 F.3d 696, 703 (7th Cir. 2019).[3]

Regardless, before October 18, 2018, there is *no* evidence that Dr. Norge knew of an objectively serious risk that plaintiff's inmate would cause him to suffer severe psychological distress. Specifically, as to the second and third elements, plaintiff has failed to submit any admissible evidence that Dr. Norge knew of and disregarded an objectively serious risk of harm to plaintiff. In particular, he submits no evidence that: his cellmate had a sexually violent history; he had assaulted other inmates in the past; or he made a specific statement to Norge about assaulting plaintiff. In fact, the *only* evidence regarding

---

[3] Given the level of ongoing impact of his cellmate's assault, the court acknowledges the possibility that it may have been more severe, even sexual in nature, and plaintiff cannot or will not verbalize it, but as explained below, his claim still fails under the other two elements of his failure-to-protect claim.

Norge's knowledge of a potential risk from plaintiff's cellmate are second and third-hand statements in officer incident reports. But this is all out-of-court hearsay being offered for the truth of the matter asserted -- that plaintiff's cellmate told *Norge* of his intent to rape another inmate. Because plaintiff provides no sworn declaration from anyone with personal knowledge describing those statements, the statements are inadmissible at summary judgment. Fed. R. Civ. P. 56(c)(2); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (inadmissible hearsay evidence may not be considered on summary judgment). Moreover, even if the court inferred from this hearsay evidence that plaintiff's cellmate had discussed sexually assaulting another inmate with Dr. Norge, the same evidence indicates the threatened victim was *not* plaintiff, never occurred, and Norge believed would not because the inmate made such a threat so that he could have a single cell. In other words, there is no evidence that Norge *believed* there was a substantial risk that the inmate would follow through with his threats against anyone, much less plaintiff, and even if mistaken, had been negligent (or at most grossly negligent) in his evaluation. In contrast, Norge could be liable for deliberate indifference under the Eighth Amendment *only* if he was subjectively aware of the danger plaintiff faced. Accordingly, plaintiff cannot prove his failure-to-protect claim.

II.   **Mental Health Care**

The Eighth Amendment also requires prison officials to provide prisoners with mental health treatment. *Rice ex. Rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). A prisoner may prevail on a claim that he was denied mental health treatment by showing that: (1) he had an objectively serious mental health condition; and

9

(2) defendants acted with deliberate indifference to that condition. *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Since defendants do not dispute that plaintiff's mental health needs were serious and required treatment, the court will assume the same for purposes of summary judgment. However, defendants *do* dispute the second element of plaintiff's claim -- their alleged deliberate indifference -- which relates to their subjective state of mind. *Perez v. Fenoglio*, 792 F.3d 768, 776–77 (7th Cir. 2015); *Arnett*, 658 F.3d at 750. To show that a defendant acted with deliberate indifference, a plaintiff must show that the defendant knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

Plaintiff contends that Drs. Norge and Butts both acted with deliberate indifference to his mental health by failing to address ongoing depression, anxiety and paranoia developed after his cellmate threatened to sexually assault him. Unfortunately for plaintiff, a reasonable jury could not find the same based on the limited evidence he provided at summary judgment. If anything, the evidence shows that plaintiff received frequent and consistent appointments with psychological services staff that were both appropriate for his mental health status and responsive to his requests for care. Specifically, as to the two named defendants, plaintiff saw Dr. Norge shortly after the October 18 incident, then saw a different psychiatrist less than three weeks later. Between December 2018 and May 2019, plaintiff then met with psychological services staff 12 more times, after which *he* reported improvement and did not request care again until the end of December 2019. While psychological services staff saw Randolph again in January 2020, and tried to see him again in February 2020, each occurred in prompt response to plaintiff's numerous

PSRs, the frequent check-ins from psychological services staff, or the relatively minor mental health concerns, relative to many other inmates. Thus, a reasonable jury could neither conclude that defendants Norge or Butts, nor that any other member of CCI's psychological services staff, acted with deliberate indifference to plaintiff's mental health needs, and defendants are entitled to summary judgment on this claim as well.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Stephen Butts and Daniel Norge (dkt. #19) is GRANTED.

2. The clerk of court is directed to enter final judgment for defendants and close this case.

Entered this 28th day of November, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge